IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERCED ROJAS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 5913 |
| | ) | |
| TOWN OF CICERO, | ) | |
| LARRY DOMINICK, President of the | ) | |
| Town of Cicero, in his individual capacity, | ) | |
| DEREK DOMINICK, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On October 15, 2008, plaintiff Merced Rojas ("Rojas") filed a complaint against

defendants Town of Cicero ("Town"), Larry Dominick, the President of the Town, and Derek

Dominick, the Human Resources Director for the Town (collectively "Defendants"), asserting

claims under 42 U.S.C. § 1983 for racial discrimination in violation of his rights under the

Fourteenth Amendment (Count I) and for political retaliation and violation of his right to

freedom of association under the First Amendment (Count II). (Compl. ¶¶ 1, 16, 18; Dkt. No.

144, Rojas Resp. Town SOF ¶ 53.) Currently before the court are the Town's and Derek

Dominick's Motions for Summary Judgment (Dkt. Nos. 112, 116). For the reasons explained

below, Derek Dominick's Motion is granted and the Town's Motion is granted in part and

denied in part.


BACKGROUND

For purposes of the Defendants' Motions for Summary Judgment, the relevant facts of this case are described below in the light most favorable to Rojas. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

I.      The Parties

Plaintiff Merced "Mercy" Rojas worked as a handyman in the Town's Department of Senior Services for eleven years. (Dkt. No. 150, Dominick Resp. Rojas SOF ¶ 1.)[1] In that position, his job responsibilities included making minor repairs to the homes of the Town's senior citizen residents. (Rojas Resp. Town SOF ¶ 56.) Rojas and his wife, Ana Maria Montes de Oca-Rojas, are Mexican and Hispanic. (Dominick Resp. Rojas SOF ¶ 6.)

Defendant Larry Dominick is the president of the Town. He was elected to that position in February of 2005 and sworn into office on May 10, 2005. (Rojas Resp. Town SOF ¶¶ 54-55.) As the highest ranking official in the Town, Larry Dominick has the authority to suspend and terminate Town employees. (Dominick Resp. Rojas SOF ¶ 48.)

Defendant Derek Dominick is Larry Dominick's son. He is the Human Resources Director for the Town (Dkt. No. 143, Rojas Resp. Dominick SOF ¶¶ 2, 5) and has held that position since March 31, 2006 (*id.* ¶ 2). As Human Resources Director, Derek Dominick's duties include taking care of the Town's health insurance, life insurance, pensions, IMF pensions, as well as reviewing payroll. (*Id.*) Derek Dominick also works with the Town's Office of the Inspector General and the Town's Internal Affairs Department, which are

_____

[1] The Town has adopted both Derek Dominick's statement of material facts as its material facts numbers 1-52 and Derek Dominick's responses to Rojas's statement of additional material facts. (*See* Dkt. No. 118, Town SOF 1; Dkt. No. 152, Town Resp. Rojas SOF 1.)

responsible for investigating complaints against Town employees (Rojas Resp. Dominick SOF ¶ 3),[2] but he does not personally investigate complaints. (*Id.* ¶ 4.) Instead, the Town's Office of the Inspector General or Internal Affairs Department inform Derek Dominick of the results of the investigations and provide him a copy of the investigation report, or a portion thereof, to put in the respective employee's personnel file. (*Id.*) Derek Dominick does not determine whether the proposed discipline in the report is appropriate but only reviews the reports to be aware of what the investigation was about and why the employee was investigated. (*Id.*)

II.     Events Leading Up to Rojas's Termination

Rojas's in-laws own the *El Dia* newspaper. (Dominick Resp. Rojas SOF ¶ 10.) Sometime after Larry Dominick was elected president, *El Dia* began publishing negative articles about him. (*Id.*; Town Resp. Rojas SOF ¶ 10.) Rojas and his wife also withdrew their support for Larry Dominick at some point after the 2005 election. (Rojas SOF ¶ 10.) After the negative articles were published in the *El Dia* newspaper, Larry Dominick openly criticized the Montes de Ocas family and said he was going to "drown" them. (Del Angel Dep. 15:8-18; 32:24-33:3.) He also made references to Montes de Ocas family as "wetbacks," but the record cited to the court does not identify when these latter discriminatory statements allegedly were made (*See* Rojas Ex. J, Arista Dep. 108:8-109:3.)

In January 2006, Jose Alejandro "Alex" Arista, held the title of Recycling Coordinator for the Town (Rojas Resp. Dominick SOF ¶ 6), but his "real position" was "working for Larry Dominick as a political runner" (Rojas Ex. J, Arista Dep. 33:15-24). Arista's girlfriend, Maricela Guzman also was a resident of the Town. (Rojas Resp. Dominick SOF ¶ 7.) On or

---

[2] The Internal Affairs Department's investigations primarily involve the Town's police department while the Office of the Inspector General's investigations involve the rest of the employees for the Town. (Rojas Resp. Dominick SOF ¶ 3.)

before January 25, 2006, Guzman noticed a water leak in her basement and contacted Arista to let him know about the problem. (*Id.* ¶ 10.) Arista then contacted Rojas's wife, Ms. Montes de Oca-Rojas, to see if Rojas knew anything about plumbing. (*Id.* ¶ 11.) Rojas's wife informed Rojas about the possible work at the Guzman residence, and Rojas contacted Arista about fixing the leak. (*Id.* ¶ 12.) Because the Town's handymen are allowed to have side jobs as long as they do not perform work during the hours they are working for the Town, if Rojas performed the plumbing job outside of his regular working hours, which were 8 a.m. to 4 p.m., he would not have violated any Town rules by repairing Guzman's water leak. (Dominick's Resp. Rojas SOF ¶¶ 2, 8.) The parties dispute whether Rojas performed the work after 4 p.m., but at some point on January 25, 2006, Rojas went to Guzman's house to repair the leak. (Rojas Resp. Dominick SOF ¶ 26; Dkt. No. 142, Rojas Opp. Town Mot. 4.)

While at the Guzman residence, Rojas called Ruben Perez, an inspector for the Town's water department who had previously worked with Rojas on side plumbing jobs, to tell him the main valve at the Guzman residence was leaking and that the water need to be shut off to repair the leak. (Rojas Resp. Dominick SOF ¶ 14.) When Perez arrived at Guzman's residence, Rojas was already at the property with the parts and equipment. (*Id.* ¶ 17.) Rojas repaired the leak, and Guzman paid Rojas with a check for $100. (*Id.* ¶ 18.)

In April 2006, Larry Dominick saw a Town vehicle parked at a residential address for several hours. (*Id.* ¶ 39.) He asked Rolando Hernandez, the deputy superintendent of the Internal Affairs Department and the department head of the Internal Affairs Department unit, to find out who was assigned to the vehicle and see how long it was going to be parked at the residence. (*Id.* ¶¶ 24, 39.) Hernandez performed surveillance on the vehicle and determined that Rojas was driving the car. (Rojas Ex. I, Hernandez Dep. 153:7-156:7.) He then assigned the investigation to Inspector James Klosak, who at that time was an investigator in the Internal

Affairs Department.  (Rojas Resp. Dominick SOF ¶ 41; Rojas Ex. O, Klosak Dep. 16:22-17:7.)

Hernandez informed Klosak that he had received information that Rojas was spending long

periods of time at his residence during work hours, and that the purpose of the investigation was

to determine whether that information was true.  (Rojas Resp. Dominick SOF ¶ 41.)

On or around April 19, 2006, Larry Dominick had a conversation with Jose Del Angel, a

precinct captain for Larry Dominick's organization, the Cicero Voters Alliance (*see* Rojas Ex. H,

Del Angel Dep. 8:17-24), regarding Rojas.  At that time, Del Angel also was a supervisor in the

Town's Parking Enforcement Department.  (*Id.* at 10:15-12:9.)  During that conversation, Larry

Dominick expressed to Del Angel his belief that "he [Larry Dominick] should fire [Rojas]," and

that if he decided against firing Rjoas, Larry Dominick wanted him transferred to Del Angel's

department.  (*Id.*)

After Klosak completed his surveillance over Rojas, Klosak prepared a final case

summary related to the April 2006 Rojas investigation (Rojas Resp. Dominick SOF ¶ 43), and

in July 2006, Rojas received a three-day suspension and an Employee Warning Notice

("Notice").  (Dominick Ex. 7.)  The Notice states that "[b]etween April 3, 2006 and April 21,

2006," Rojas was "observed violating various sections of the Town of Cicero Employee Manual

and Established Rules of the Senior Services Department."  (*Id.*)  Specifically, it identified

certain periods of time where Rojas allegedly was "at a residence" and "not working for the

benefit of the Town of Cicero . . . without calling in this time-off to [his] supervisor."  (*Id.*)  The

Notice further accused Rojas of "driving the Town of Cicero's vehicle around the Town of

Cicero without being on an assignment and thus for no work purpose . . . without calling in this

time to [his] supervisor" (*id.*), and spending time at "locations which were unrelated to the work

[he does] for the Town of Cicero . . . without calling in this time to [his] supervisor" (*id.*).

Finally, according to the Notice, the identified violations did "not account for the times between

April 3, 2006 and April 21, 2006 that [he] stopped for lunch at various restaurants in the Town of Cicero without calling in the same to [his] supervisor" and that his supervisor had "previously given [Rojas] a verbal warning about this type of violation."  (*Id.*)

At some point in 2006, Arista spoke with Frank Aguilar about Rojas's work at the Guzman residence.  (Arista Dep. 47:3-15.)  During Arista's conversation with Aguilar, Aguilar asked Arista for a copy of the check that Guzman wrote to Rojas and told Arista that he would be rewarded for provided Aguilar with the check.  (Arista Dep. 47:3-15.)  When Arista refused to get a copy of the check, Aguilar told Arista that he could be fired.  (*Id.* at 47:19-48:1.)  Arista eventually did provide Aguilar with a copy of the check because he "fear[ed] for [his] safety and [his] girlfriend's safety."  (*Id.* at 48:14-17.)  Additionally, Aguilar instructed Arista to write the following on the check:  "Mr. President, above is a copy of the check (highlighted) paid by Maricela Guzman to Mercedes Rojas (Ana Maria Montes de Oca-Rojas' husband) for side-job performed on Town working hours."  (Rojas Resp. Dominick SOF ¶ 19; Arista Dep. 49:17-50:18.)  According to Arista, that statement "was a lie" because Rojas did not perform the work on Town time.  (Arista Dep. 51:6-13.)  Frank Aguilar had pressured Arista to write false statements on the check because "Larry [Dominick] doesn't want these people here in the Town at all and he's looking to get some—something to get him [Rojas] fired."  (Arista Dep. 47:19-48:13.)  Frank Aguilar then notified Larry Dominick of Guzman's check to Rojas.  (Rojas Resp. Dominick SOF ¶ 19.)

Commander Thomas Boyle of the Internal Affairs Department interviewed Rojas as part of an investigation into Rojas's work at the Guzman residence.  (*Id.* ¶ 22.)  During this interview, Rojas told the investigators that "[t]his is all because Larry does not like the negative articles that my father-in-law is publishing in *El Dia* and wants to find a reason to get rid of us" and "Frank

Aguilar knows that Larry wants to get rid of us." (Rojas SOF ¶ 37; *see also* Rojas Resp. Town SOF ¶ 65.)[3]  The Internal Affairs Department also interviewed Perez as part of the Rojas investigation.  (Rojas Resp. Dominick SOF ¶ 25.)

On or around September 18, 2006, while the investigation into Rojas's work at the Guzman residence was pending, Rojas's wife sent Rolando Hernandez a letter advising Hernandez of her belief that the investigation into her husband was politically motivated and based on the negative articles written in the *El Dia* newspaper in the recent months concerning the Larry Dominick administration.  (Rojas Resp. Dominick SOF ¶ 28; Hernandez Dep., 141:3-142:23; Rojas Ex. BB.)  Counsel for Ms. Montes de Oca-Rojas sent a letter dated August 28, 2006, to Town attorney Holly Tomchey complaining of harassment and retaliation against the

---

[3]  The Defendants argue that Rojas's declaration (Rojas Ex. A) "should be stricken as a discovery violation" because it was not disclosed "to the defendants until months after discovery closed" and "only produced as part of his response to Defendants' motion for summary judgment." (Dominick Resp. Rojas SOF  ¶ 20.)  Because "[n]one of these averred statements are contained in [Rojas's] written discovery or his deposition," the Defendants argue that they "should be disregarded as a blatant discovery violation."  (*Id.*)  As the Seventh Circuit has explained, however, "where the deposition testimony is ambiguous or incomplete . . . the witness may legitimately clarify or expand upon that testimony by way of an affidavit."  *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999).  Notably, the Defendants do not contend that this declaration contradicts Rojas's deposition testimony.  Furthermore, except for identifying a potential witness, Barry Pechter, who Rojas did not disclose in his October 2009 supplemental interrogatory responses (*see* Rojas Ex. CC), the Defendants do not specifically list any discovery requests to which the remaining information contained in Rojas's declaration would have been responsive.  (*See* Dominick Resp. Rojas SOF  ¶ 20; Dkt. No. 148, Dominick Reply 5.)  Instead, they generally refer to "Exhibit 2" (selected discovery responses from Rojas) and "Plaintiff's Exhibit F" (Rojas's Deposition) without providing any pinpoint citations for the court.  (*See* Dominick Resp. Rojas SOF  ¶ 20; Dkt. No. 148, Dominick Reply 5.)   The Seventh Circuit has repeatedly cautioned that "[j]udges are not like pigs, hunting for truffles buried in [the record]."  *Gross v. Town of Cicero*, 2010 WL 3365285, at *4 (7th Cir. Aug. 27, 2010) (alteration in original).  Consequently, although  the court agrees with the Defendants that Rojas should have previously disclosed Pechter during discovery and therefore has not considered the declaration's references to Pechter in ruling on Defendants' Motions, with respect to the remainder of the declaration, the courts finds that at this time the Defendants have not sufficiently supported their arguments for striking the declaration.  Nevertheless, the statements in Rojas's declaration are not necessary to this court's disposition of the Defendants' Motions.

Town.  (Dominick Resp. Rojas SOF ¶ 43; Town Resp. Rojas SOF ¶ 43; Rojas Ex. W.)  Counsel

for Rojas's wife then sent a second letter, dated October 13, 2006, to Town attorneys, Holly

Tomchey and Mike Delgado, again raising Ms. Montes de Oca-Rojas's complaints against the

Town.  (Dominick Resp. Rojas SOF ¶ 43; Town Resp. Rojas SOF ¶ 43; Rojas Ex. V.)

     Shortly before October 16, 2006, Jose Del Angel had a conversation with Larry

Dominick regarding Rojas.  Larry Dominick told Del Angel that "[h]e was upset about a letter

that apparently [Rojas's] wife had sent to the Town."  (Del Angel Dep. 22:1-5.)  According to

Del Angel, Larry Dominick made "comments like I can't believe . . . this chic is threatening to

sue us . . . . I should fire her husband" and "I should fire his ass for sending that letter."  (*Id.* at

22:1-13; 22:19-24.)  On October 16, 2006, Rojas was terminated from his position (Rojas Resp.

Dominick SOF ¶ 34), and Derek Dominick informed Rojas of his termination (*id.*).

## LEGAL STANDARD

     Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  In making this assessment, "[a]ll facts and reasonable inferences are

to be construed in favor of the nonmoving party," but "[i]nferences that are supported by only

speculation or conjecture will not defeat a summary judgment motion."  *Fischer v. Avanade,

Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (quoting *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir.

2007), and *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).  "[W]hen

confronted with a motion for summary judgment, a party who bears the burden of proof on a

particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific

factual allegations, that there is a *genuine* issue of material fact which requires trial."  *Beard v.

Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original).

I.      Claims Against the Town

Rojas has asserted claims under 42 U.S.C. § 1983 for racial discrimination in violation of his rights under the Fourteenth Amendment (Count I) and for political retaliation and violation of his right to freedom of association under the First Amendment (Count II). (Compl. ¶¶ 1, 16, 18; Rojas Resp. Town SOF ¶ 53.) As an initial matter, the court notes that under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is only subject to § 1983 liability if the plaintiff can prove "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Darchak v. Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (quoting *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 494 (7th.Cir. 2002)). In this case, however, the Town has not challenged Rojas's ability to establish *Monell* liability but rather focuses on the merits of Rojas's underlying constitutional claims, which the court discusses below.

A.      Claim for Racial Discrimination

"The same standards for proving intentional racial discrimination apply to Title VII and §1983 equal protection claims." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 976 (7th Cir. 2006). To prevail on a § 1983 claim for racial discrimination, "the plaintiff must prove that he suffered discrimination because of his race." *Id.* A plaintiff can establish unlawful racial discrimination by relying on either the direct or indirect method of proof. *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). Here, Rojas proceeds under both methods.

To prove intentional discrimination under the direct method, the plaintiff "must present direct or circumstantial evidence that creates a 'convincing mosaic of discrimination' on the basis of race." *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). A prima facie case of racial discrimination under the indirect method, in contrast, requires a

showing that "(1) [the plaintiff] is a member of a protected class, (2) [his] job performance was meeting [his] employer's legitimate expectations, (3) [he] was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably." *Id.* To demonstrate that another employee is similarly situated, "a plaintiff must show that there is someone who is directly comparable to [him] in all material respects." *Id.* at 605 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Once the plaintiff establishes a prima facie case with respect to his claim for racial discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action, 'which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). If the defendant presents such a nondiscriminatory reason, the burden then shifts back to the plaintiff to "establish by a preponderance of the evidence that the defendant's proferred reasons are pretextual." *Id.* at 737 (quoting *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995)). To establish a genuine issue of material fact regarding pretext, the plaintiff "must show that '1) it is more likely a discriminatory reason motivated the employer than the proferred non-discriminatory reason or 2) that an employer's explanation is not credible.'" *Id.* (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).

1.      Direct Method of Proving Discrimination

According to the Town, Rojas's race discrimination claim fails under the direct method of proof because he has not established a "causal link" between Larry Dominick's alleged discriminatory statements and his termination. The court agrees. In the employment discrimination context, the Seventh Circuit has expressly required that the plaintiff demonstrate

that the alleged statements "were made contemporaneously to the adverse employment action."

*Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002). Here,

Rojas relies on Larry Dominick's purported comments during the precinct captain meetings

where he allegedly referred to the Montes de Ocas family as "wetbacks." (Rojas Ex. J, Arista

Dep. 108:8-109:3.) Rojas, however, has not provided any evidence of when these statements

actually occurred; without evidence of the temporal proximity of these statements to Rojas's

termination, the court finds that these statements are insufficient to support a finding of racial

discrimination under the direct method of proof.[4]

### 2. Indirect Method of Proving Intentional Discrimination

The Town argues that under the indirect method, Rojas lacks evidence that a similarly

situated employee was treated more favorably than Rojas. Again, the court agrees. Rojas argues

that Gary Lelis, a Caucasian, is a handyman in the Department of Senior Services who is

similarly situated to Rojas. (Dominick Resp. Rojas SOF ¶ 6.) In his affidavit, Rojas attests that

---

[4] Rojas additionally relies on the Declaration of Joel Serrano (Rojas Ex. L) as support for his
racial discrimination claim. The Town argues that Serrano's Declaration should be stricken as
"a discovery violation" because Rojas never "disclose[d] the details" of the information
contained in Serrano's Declaration. (Dominick Resp. Rojas SOF ¶ 11.) The court finds that at
this time it need not decide whether Serrano's Declaration is admissible because the declaration
does not resolve the deficiencies in Rojas's prima facie case for racial discrimination: namely,
Rojas's inability to prove the causal connection between Larry Dominick's allegedly
discriminatory statements and Rojas's termination. Serrano simply attests that he "regularly
attended precinct captain meetings . . . from 2005 until April 2007" (Serrano Decl. ¶ 3), and that
he "frequently heard Larry Dominick use derogatory terms to refer to Hispanics and Mexicans at
precinct meetings" (*id.* ¶ 4), but he does not specifically address when those statements occurred.
The court finds that generally identifying an almost two year period within which Larry
Dominick allegedly made derogatory statements does not demonstrate the requisite temporal
proximity between the statements and Rojas's termination to establish a prima facie case of
racial discrimination. *See Markel*, 276 F.3d at 910 (finding that statements made between
November 1998 and March 1999 "were not made contemporaneously to the adverse employment
action" when removal from employment position occurred in May 1999).

both he and Lelis "drove together to carry out [their] assignments for about two months up until April 2006" and that "[n]either of them regularly called in their lunches during the time they drove together." (Rojas Ex. A, Rojas Decl. ¶ 7.) Because "only Rojas was placed under surveillance, culminating in a suspension and then termination" (Rojas Opp. Town Mot. 10), Rojas claims that Lelis was treated more favorably than Rojas (*id.*). The court disagrees that Rojas has presented sufficient evidence from which a reasonable jury could find that Lelis was similarly situated to Rojas "in all material respects." *Winsley*, 563 F.3d at 605 (quoting *Patterson*, 281 F.3d at 680).

Specifically, the parties do not dispute that Larry Dominick initiated the investigation into Rojas or that Larry Dominick, as the highest ranking official in the Town, has the authority to suspend and terminate Town employees. Rojas, however, has not presented any evidence from which a jury could reasonably infer that either Larry Dominick or another Town employee with the authority to terminate employees also knew that Lelis, like Rojas, did not regularly call in his lunch. Without such knowledge, Lelis is not similarly situated with Rojas, and the failure to launch an investigation into Lelis is not evidence of unlawful discrimination. *See Smith v. Dunn*, 368 F.3d 705, 709 (7th Cir. 2004).

Rojas also argues that the evidence demonstrates that no other Senior Services employee was subjected to surveillance or investigated and terminated for doing a side job on Town time. However, because Rojas has not presented any evidence of the race or national origin of these other employees, a jury would be forced to speculate that these employees were outside of the protected class, i.e., not Mexican or Hispanic. Thus, the evidence of the lack of surveillance or investigations into other Senior Services employees, like the evidence related to Gary Lelis, is not sufficient to show that these other employees were "similarly situated" with Rojas. Consequently, viewing the evidence in the light most favorable to Rojas, the court finds that he

has not established a prima facie case of racial discrimination under the indirect method of proof. The Town therefore is entitled to summary judgment on Rojas's § 1983 racial discrimination claims.

B.      First Amendment Claims

The Town has also moved for summary judgment on Rojas's claims under the First Amendment.  To establish a prima facie case for political retaliation under the First Amendment, the plaintiff must demonstrate that "(1) [he] engaged in constitutionally protected speech; (2) [he] suffered a deprivation likely to deter [him] from exercising [his] First Amendment rights; and (3) [his] speech was a motivating factor in [his] employer's adverse action." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009).  Once the plaintiff establishes the prima facie case, "the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech." *Id.*  If the employer in turn satisfies this burden, "the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising [his] First Amendment rights." *Id.*

Here, from what the court is able to discern from the arguments in Rojas's briefs, he has identified at least five bases for his First Amendment political retaliation claims: (1) Rojas's complaint of political retaliation during his interview with the Town's Internal Affairs Department investigators regarding his work at the Guzman residence; (2) his wife's complaint of political retaliation against her husband in her letter to Hernandez; (3) the letters sent to the Town on behalf of Rojas's wife; (4) the negative articles about Larry Dominick in the *El Dia* newspaper; and (5) Rojas and his wife's withdrawal of their political support from President Dominick.  The court divides Rojas's First Amendment claims into two general categories: those predicated on protected speech and those predicated on political affiliation.

1.      Claims Based on Protected Speech

First, to the extent that Rojas relies on statements by or on behalf of his wife complaining of retaliation and harassment or statements by his wife's parents in the *El Dia* newspaper to support for his claim that the Town infringed on his right to engage in protected speech, he has offered no legal authority supporting his ability to base such a claim on statements made by third parties nor has he explained how his termination, if motivated by the protected speech of third parties, is "likely to deter [him] from exercising [his] First Amendment rights." *Valentino*, 575 F.3d at 670. While such statements, as discussed below, ultimately may be relevant to proving his claims for retaliation based on political affiliation or a violation of his right to familial association, Rojas has failed to link these statements to a violation of *his* right to engage in constitutionally protected speech.

Second, with respect to Rojas's alleged statements complaining of political retaliation during his interview with the investigators from the Town's Internal Affairs Department, the court finds that Rojas has failed to present evidence from which a jury could reasonably infer that these statements were a motivating factor behind his termination. According to Rojas, after he raised the issue of political retaliation during the interview, the investigators' "tone changed." (Rojas Resp. Town SOF ¶ 65; Rojas Opp. Town Mot. 11.) From what the court is able to discern from Rojas's arguments, Rojas is relying on this change in the interviewers' tone to support an inference that Rojas's complaints of retaliation caused the investigators to claim that Rojas was uncooperative during the interview. (*See* Rojas Opp. Town Mot. 11.) Rojas apparently would then ask the court to draw yet another inference that the investigators' belief that Rojas was uncooperative during the interview led to his termination. Notably, Rojas offers no explanation of how the investigators' "tone changed," and the court finds that such vague and ambiguous testimony, which requires drawing inference upon inference to establish the causal chain

14

between the alleged statements and Rojas's termination, does not support a reasonable inference that Rojas's alleged claims of political retaliation during the interview were a motivating factor behind his termination. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). Consequently, viewing the evidence in the light most favorable to Rojas, the court finds that he has failed to present sufficient evidence to support his claim under the First Amendment for retaliation based on protected speech.

### 2. Claims Based on Political Affiliation

Rojas also bases his First Amendment claim for political retaliation on Rojas, his wife, and her family withdrawing their political support of Larry Dominick. "The First Amendment prohibits a state employer from terminating the employment of a worker on the basis of [his] political beliefs unless political affiliation is an appropriate requirement for the position." *Moss v. Martin*, 614 F.3d 707, 710 (7th Cir. 2010). The Town does not dispute that Rojas, as a handyman for the Town, could not be terminating on the basis of his political beliefs. Instead, it argues that Rojas and his wife could not "specify how they 'withdrew their support' from President Dominick," and that Rojas therefore could not establish a "causal link" between his political affiliation and his termination. (Dkt. No. 160, Town Reply 13.) The court disagrees and instead finds that Rojas has presented sufficient evidence of retaliation based on political affiliation to survive summary judgment.

First, Rojas has presented evidence from which a jury could reasonably infer that Rojas withdrew his support from Larry Dominick and that Larry Dominick was aware that Rojas was no longer supporting him. For example, the Town does not dispute that Larry Dominick was aware that Rojas was married to Ana Maria Montes de Oca-Rojas or that her parents owned the *El Dia* newspaper. Nor does the Town dispute that the *El Dia* newspaper began publishing

negative articles about Larry Dominick after he was elected. Based on this evidence, the court finds that a jury could reasonably infer that Rojas was affiliated with the anti-Larry Dominick views of his in-laws and that Larry Dominick was aware of that affiliation.

Furthermore, Rojas also presented testimony that Larry Dominick openly criticized the family during the time period after the *El Dia* newspaper began publishing the negative articles about him. Specifically, Del Angel testified that at a precinct meeting after the articles had been published, Larry Dominick said he was going to "drown" the Montes de Ocas family. (Del Angel Dep. 15:8-18; 32:24-33:3.) From this evidence, the court finds that a jury could reasonably infer that Rojas's affiliation with the Montes de Ocas family was the motivating factor behind his termination. *See Soderbeck v. Burnett County*, 752 F.2d 285, 287-88 (7th Cir. 1985) (recognizing that First Amendment protected plaintiff from being fired because "she was the wife and presumed ally of [the defendant's] political adversary"). Consequently, viewing the evidence in the light most favorable to Rojas, the court finds that he has sufficient evidence to establish a prima facie case of retaliation based on political affiliation.

C.     Familial Association Claims

In his complaint, Rojas also alleges that the Town violated his right to familial association (Compl. ¶ 16, 18), which he apparently incorporates into his First Amendment claim (Count II). (*See* Rojas Opp. Dominick Mot. 10 ("It is well-settled that the First Amendment protects people in their familial associations.").) The Town, however, did not address this claim in its Motion, and "[a]rguments raised for the first time in a reply brief are waived." *See, e.g., United States v. Li*, 615 F.3d 752, 757 (7th Cir. 2010). Consequently, the court finds that the Town is not entitled to summary judgment on Rojas's claim for violation of his right to familial association.

However, based on its review of the parties' rather cursory submissions, the court notes

that Rojas and the Town appear to have a fundamental disagreement over whether the Seventh

Circuit recognizes such a claim.  In his Opposition to Derek Dominick's Motion for Summary

Judgment, Rojas argues, without identifying any Seventh Circuit precedent, that "[i]t is well-

settled that the First Amendment protects people in their familial associations."  (Rojas Opp.

Dominick Mot. 10.)  The Town, in its Reply, simply contends that the "Seventh Circuit has

never recognized" this right without offering much further elaboration.  (Town Reply 13.)  Based

on the court's own research, the Seventh Circuit has recognized a right of intimate association,

which is the broader right encompassing the right of familial association, *see Griffin v. Strong*,

983 F.2d 1544, 1547 (10th Cir. 1993) ("The freedom of intimate association is a substantive due

process right, as is its subset, the familial right of association."), but does not appear to ground

that right in the First Amendment.  In *Montgomery v. Stefaniak*, 410 F.3d 933 (7th Cir. 2005),

the court explained that

> the Constitution protects two distinct forms of free association.  The first, freedom
> of expressive association, arises from the *First Amendment* and ensures the right
> to associate for the purpose of engaging in activities protected by the *First
> Amendment*.  The second, freedom of intimate association, protects the right 'to
> enter into and maintain certain intimate human relationships.'  The freedom of
> intimate association 'receives protection as a fundamental element of personal
> liberty,' and as such is protected by the due process clauses.

*Id.* at 937 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984)) (internal citations

omitted).  Other circuit courts, on the other hand, have found that the right stems from the First

Amendment.  *See Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999); *see also Piscottano v. Murphy*,

511 F.3d 247, 278 (2d Cir. 2007) ("[T]he source of the intimate association right has not been

authoritatively determined." (quoting *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999))).

Unfortunately, because the Town did not raise this argument until its Reply, neither party has

fully addressed the constitutional basis for a familial association claim or explained whether that

basis is material to analyzing Rojas's claim.  To ensure that this claim is properly framed for the

jury, the court requests that the parties prepare trial briefs specifically related to Rojas's claim for violation of his right to familial association, as explained more thoroughly below.

D.      Evidence of Pretext

The Town argues that it "has asserted a non-discriminatory reason for Rojas' termination, specifically that he was terminated for doing work on Town time for personal gain coupled with his previous suspension for wasting time on Town time." (Town's Reply 14.) Assuming without deciding that the Town is able to successfully rebut Rojas's prima facie case of retaliation for political affiliation or familial association, the court finds the Rojas has presented sufficient evidence of pretext for his claims to be considered by a jury. "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)). Here, Rojas has proffered testimony from Alex Arista, in which Arista states that Frank Aguilar had pressured him to write false statements on the check from Guzman to Rojas because "Larry [Dominick] doesn't want these people here in the Town at all and he's looking to get some—something to get him [Rojas] fired." (Arista Dep. 47:19-48:13.) Such evidence creates a genuine issue of material fact as to whether the Town's purported reasons for firing Rojas were pretextual.

The Town seeks to strike Aguilar's statements as inadmissible hearsay because Aguilar "has no authority or input over personnel decisions generally or specifically with respect to Rojas, and he was not a supervisor of Arista or Rojas" (Town Reply 6), but the court disagrees and instead finds that these statements qualify as a admission of a party opponent. Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay if it is "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 802(d)(2)(D). In this case, although Aguilar's

18

official title was Director of Community Affairs, he testified at his deposition that he "assist[s] [Larry Dominick] in everything with the administration outside of . . . those types of things pertaining to my job" and that he had been called "Assistant to the President," "Vice President," and "Chief of Staff." (Rojas Ex. DD, Aguilar Dep. 64:1-65:10.) The parties do not dispute that Larry Dominick, as the highest ranking official in the Town, has the authority to suspend and terminate Town employees (Dominick Resp. Rojas SOF ¶ 48) or that Larry Dominick initiated the April 2006 investigation into Rojas. Aguilar's working relationship with Larry Dominick, which, as demonstrated by Aguilar's testimony, transcended the responsibilities related to his official title of Director of Community Affairs, supports the finding that Aguilar's statements to Arista were made within the scope of his employment with the Town. Moreover, the Town's admission that Aguilar received a copy of Guzman's check and brought the check to the attention of Larry Dominick (Dominick SOF ¶ 19) undermines its attempt to insulate Aguilar from the investigation into Rojas. Consequently, based on the record currently cited to the court, the court finds that Aguilar's statements to Arista concerned matters within the scope of his employment with the Town and thus qualify as party admissions under Rule 801(d)(2)(D). The court accordingly has considered Aguilar's statements in connection with the Town's Motion for Summary Judgment and finds that they create a genuine issue of material fact as to whether the purported reasons for Rojas's termination were pretextual. As a result, the court finds that Rojas's claims for retaliation based on political affiliation and violation of his right to familial association survive the Town's Motion for Summary Judgment.

II.     Claims Against Derek Dominick

Rojas asserts the same § 1983 claims against Derek Dominick as those discussed above in connection with the Town's Motion for Summary Judgment and apparently bases his claims against Derek Dominick on a theory of supervisory liability. According to Rojas, "It is well-

established that a defendant may be held responsible under section 1983 where the defendant knew about the wrongful conduct 'and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye.'" (Rojas Opp. Dominick Mot. 9 (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (alterations in original)).) As the Seventh Circuit explained in *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010), however, after the Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009), "an equal protection claim against a supervisor requires a showing of intentional discrimination." *Id.* at 588. Thus, although prior Seventh Circuit precedent "would have previously allowed a plaintiff to recover from a supervisor based on that supervisor's 'deliberate indifference' toward a subordinate's purposeful discrimination,' after *Iqbal* a plaintiff must also show that the supervisor possessed the requisite discriminatory intent." *Id.* (internal citations omitted). This same standard applies to claims under the First Amendment. *See Iqbal*, 129 S. Ct. at 1948.

In this case, Rojas relies on the pre-*Iqbal* standard, arguing that Dominick is liable for his "deliberate indifference." Specifically Rojas contends that Dominick had a "head-deep-in-the-sand approach" and was "unwilling to take a stand against retaliatory actions and threats made by Town Larry Dominick" and instead "condoned" those actions. (Rojas Opp. Dominick Mot. 10.) As explained in *Grindle*, however, the relevant consideration is not whether Dominick *condoned* discriminatory actions but rather whether Derek Dominick possessed the requisite discriminatory intent. Rojas has not argued or presented any evidence that Derek Dominick intended to discriminate or retaliate against Rojas. Nor has Rojas presented any evidence that Dominick played any role in the Internal Affairs investigation into Rojas or in the ultimate decision to terminate him. Instead, Rojas relies on Larry Dominick's deposition testimony that Derek Dominick has "the power to fire somebody if they're written up enough times." (Rojas SOF ¶ 62.) As Larry Dominick further explained, however, he has not "delegated any authority

to . . . Derek Dominick with respect to hiring and firing" and "if there's enough write-ups" Derek Dominick would bring the write ups to the legal department which then forwards the information to Larry Dominick. (Rojas Ex. K, Larry Dominick Dep. 69:16-70:2.) During his deposition, Derek Dominick confirmed that Larry Dominick did not give him the authority to suspend or fire employees. (Derek Dominick Dep. 19:5-17.) The court therefore finds that Larry Dominick's singular statement that under some circumstances Derek Dominick "has the power to fire somebody if they're written up enough times," is insufficient evidence to support a reasonable inference that Derek Dominick intended for Rojas to be retaliated or discriminated against. *See, e.g., Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion."). Consequently, because Rojas has failed to present sufficient evidence from which a jury could reasonably find in his favor on any of his § 1983 claims against Derek Dominick, Derek Dominick's Motion for Summary Judgment is granted.

<u>CONCLUSION</u>

For the reasons explained above, Derek Dominick's Motion for Summary Judgment (Dkt. No. 112) is granted. Judgment is entered in favor of defendant Derek Dominick on all of plaintiff Rojas's claims against him. Defendant Town of Cicero's Motion for Summary Judgment (Dkt. No. 116) is granted in part and denied in part. Judgment is entered in favor of defendant Town of Cicero with respect to plaintiff Rojas's claim under § 1983 for racial discrimination (Count I) and Rojas's claim under the First Amendment (Count II), to the extent that claim was predicated on alleged violations of protected speech. However, defendant Town of Cicero's Motion for Summary Judgment with respect to Rojas's claims under the First Amendment for retaliation for political association and his claims for violation of his right to familial association is denied.

The date for submitting the Final Pretrial Order is extended to November 10, 2010, to allow the parties time to discuss settlement and submit trial briefs on Rojas's claim for violation of his right to familial association. Specifically, the court requests that Rojas file a trial brief by November 10, 2010, explaining both the constitutional basis for the right to familial association in the Seventh Circuit and the appropriate test for determining whether that right has been violated. Responses to motions *in limine* and the Town's and Larry Dominick's responses to Rojas's trial brief on his right to familial association claim are due by November 17, 2010. All other dates remain. Status is set for November 9, 2010 at 9:00 a.m. The parties are strongly encouraged to discuss settlement.

ENTER:

_James F. Holderman_

_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: October 14, 2010